Ford v. Brown.

BETTY FORD *et al. v.* H. C. BROWN & CO. *et al.*

(*Nashville.* December Term, 1904.)

1. **BILLS AND NOTES.** Purchaser of time certificates of deposit in name of one as trustee acquires no title against the beneficiary, where such trustee had no power to dispose of them, when.

Interest bearing certificates of deposit, with a definite time of maturity, not subject to check, issued by a bank to one as trustee simply, or to one as trustee for a certain named person, and so indorsed by him sometime before maturity, operate as actual notice or knowledge to the indorsee and the subsequent purchaser from such indorsee in due course of trade that such certificates represent and constitute trust funds, and they must inquire into the power of disposition of the trustee; and where such certificates were so indorsed by the trustee in payment of his gambling debt, without authority from the beneficiary to dispose of them in this manner or otherwise, the purchaser thereof from such indorsee without personal knowledge is nevertheless chargeable with actual knowledge, and acquires no title as against the beneficiary.

Acts cited and construed: Negotiable Instruments Law (Acts 1899, ch. 94), sec. 56.

Cases cited and approved: Alexander v. Alderson, 7 Bax., 403; Covington v. Anderson, 16 Lea, 310; Caulkins v. Gaslight Co., 85 Tenn., 684; Bank v. Looney, 99 Tenn., 278; Bank v. Butler, 5 Cates, 574; Fox v. Bank (Tenn. Chy. App.), 35 L. R. A., 678; Duncan v. Jordan, 15 Wall., 175; Swift v. Smith, 102 U. S., 442; Bank v. Lange, 51 Md. 138; Shaw v. Spencer, 100 Mass., 382; Cohnfeld v. Tannenbaum, 176 N. Y., ——; Hazeltine v. Keenan, 54 W. Va., 600.

2. **SAME. Same. Facts overlooked by purchaser will not relieve him of consequences.**

The fact that the purchaser of the time certificates of deposit overlooked the fact that they were such, and paid cash for them will not relieve him of responsibility as to any notice they themselves give. (*Post, pp.* 471, 472, 481, 482.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —JOHN ALLISON, Chancellor.

JOHN RUHM, for complainants.

WHEELER & TRIMBLE, for Chattanooga Savings Bank.

JAS. A. RYAN, for H. C. Brown & Co.

WALTER STOKES, for First National Bank.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

Complainant exhibited this bill against the defendants, Henry C. Brown, Fred Laitenberger and Jesse Trinum, as individuals, and as a partnership using the firm name of H. C. Brown & Co., against the First National Bank of Nashville, Tennessee, and the Chattanooga Savings Bank. The principal object of the bill was to enjoin the Chattanooga Savings Bank against the payment of two certificates of deposit which that

bank had issued to Woodworth as trustee for complainant, Betty Ford, and which certificates of deposit had been indorsed and transferred by Woodworth to H. C. Brown & Co., in payment of a gambling indebtedness. H. C. Brown & Co. indorsed said certificates of deposit to the First National Bank of Nashville and that bank had forwarded the certificates to Chattanooga, and was seeking to collect them from the Chattanooga Savings Bank at the time the original bill herein was filed. It is alleged that these two certificates of deposit represented the earnings of the complainant, Betty Ford, as a domestic in the family of D. Woodworth, Jr., of Chattanooga, during a period of eighteen or twenty years. D. Woodworth, Jr., had died and the certificates of deposit, which had been issued to him, were changed and issued in the name of C. N. Woodworth, trustee. These certificates of deposit were as follows:

"Chattanooga Savings Bank.

"13493.        Chattanooga, Tenn., Oct. 7, 1902.

"C. N. Woodworth, trustee, has deposited in this bank $994.97, payable to the order of same, twelve months after date, with interest to maturity only at the rate of four and one-half per cent. per annum, upon the return of this certificate properly indorsed. Not subject to check.

'R. W. BARR, Cashier."

"Chattanooga Savings Bank.

"No. 13704.    Chattanooga, Tenn., March 21, 1903.

"C. N. Woodworth, trustee for Betty Ford, has de-

posited in this bank thirteen hundred and seventy-five and fifty-five one-hundredths dollars ($1375.55), payable to the order of same twelve months after date, with interest to maturity only at the rate of four and one-half per cent. per annum upon the return of this certificate properly indorsed. Not subject to check.

"R. W. BARR, Cashier."

The Chattanooga Savings Bank answered the bill and averred that it had issued the certificates, but had refused to pay the same, because they were not due and because it had received notice from Betty Ford not to pay them; that it had no interest in the controversy, but was willing to pay the certificates to whomsoever the court might adjudicate they should belong.

The defendants, H. C. Brown & Co., also answered the bill denying all of its material allegations.

The First National Bank of Nashville also answered denying all knowledge upon its part of the gambling transactions, and all knowledge of the relations between Woodworth and Betty Ford, and denied any knowledge that its codefendants had conducted any gambling establishment or rooms; denied all knowledge of the intoxication of Woodworth or of his transaction with H. C. Brown & Co. with regard to said certificates. It admitted, however, that on April 24, 1903, these certificates of deposit were presented by H. C. Brown & Co. to the First National Bank at Nashville for discount, and avers that it purchased said certificates from H. C. Brown & Co., and paid their face value in cash, and

then sent the certificates to Chattanooga for collection. It avers that it took these certificates in due course of trade for a valuable consideration and without any notice of the rights and equities of Betty Ford or of anyone else, and avers that it is an innocent holder for value in due course of trade and without notice.

The court of chancery appeals finds that C. N. Woodworth, having possession of these certificates, brought them to Nashville, Tennessee, and on or about the 22nd or 23rd, or possibly the 24th or 25th of April, 1903, he went to the gambling-house located over the Climax saloon on Cherry street, in Nashville, Tennessee, and there engaged in gambling. It is shown he drank heavily and lost large sums. While thus drinking and gambling he not only lost a large amount of his own money, but he also indorsed and transferred these certificates of deposit belonging to the complainant, upon which he obtained money and chips to be used in gambling. He lost and gambled away all of the money and chips so obtained except about the sum of six or seven hundred dollars, which the gamblers in charge of the place offered to repay him, but which he at the time declined.

That court further finds that H. C. Brown & Co. came into possession of these certificates, and on the 25th of April, 1903, took them to the First National Bank of Nashville, and there sold and disposed of them to the First National Bank for cash. The bank, overlooking the fact that the certificates were not due, took them for cash, as H. C. Brown & Co. were among their regu-

lar customers. They paid cash for them and sent them to Chattanooga through their correspondent at that place for collection. In the meantime C. N. Woodworth, having become to some extent rational, telegraphed the Chattanooga Savings Bank at Chattanooga not to pay these certificates. The bank at once notified the mother of C. N. Woodworth and Betty Ford, who immediately advised the bank not to pay or recognize these certificates.

It further appears that when these certificates were first presented to the First National Bank they bore the indorsement of complainant C. N. Woodworth and the indorsement of H. C. Brown & Co., but at that time the First National Bank refused to take the certificates because one of them was not properly indorsed, that is to say, it was simply indorsed by C. N. Woodworth, when it should have been indorsed as it was payable on its face, by "C. N. Woodworth, Trustee for Betty Ford." Thereupon H. C. Brown & Co. took the certificates back and returned with them in a short time properly indorsed.

The court of chancery appeals finds as a matter of fact that this new indorsement was made by C. N. Woodworth. After the indorsement was corrected the certificates were taken back to the First National Bank and on the 25th of April, the teller of the bank bought the certificates in question from H. C. Brown or H. C. Brown & Co., paying cash therefor, overlooking the fact that the certificates were not due. The officers of the

First National Bank denied all knowledge as to how H. C. Brown & Co. acquired these certificates and all knowledge of the transaction between Woodworth and H. C. Brown & Co. and their employees, or of any person who obtained these certificates of C. N. Woodworth, and the court of chancery appeals finds there is nothing in the record to indicate that these officers had any knowledge of the transactions mentioned.

The court of chancery appeals further finds there is no evidence in the record from which we are justified in finding that the officers of the bank had any knowledge in regard to the gambling carried on over the Climax saloon.

The court of chancery appeals finds that H. C. Brown & Co. were affected with full notice, and had knowledge of this embezzlement on the part of Mr. Woodworth and of this violation of his trust, and had full knowledge of his want of legal right and capacity to transfer this property. They must have known and did know that they were taking the certificates in violation of this trust and taking funds which Woodworth was practically embezzling. As to the First National Bank, there is no proof to show that the officers of the bank had any knowledge of these transactions, or even that H. C. Brown & Co. conducted gambling rooms over the Climax saloon, and hence the rights of the First National Bank must depend upon the facts disclosed upon the face of the paper itself and the indorsements thereon.

As already stated, one of these certificates was paya-

ble to C. N. Woodworth, trustee for Betty Ford, and the other simply to C. N. Woodworth, trustee. One of them was dated March 21, 1903, due twelve months after date, and the other was dated October 7, 1902, and due twelve months after that date. Each of them bear interest to maturity only at the rate of four and one-half per cent per annum. It is disclosed on the face of each certificate that it is not subject to check, but is an interest bearing certificate of deposit. The first certificate, which was made payable to C. N. Woodworth, trustee, for Betty Ford, was indorsed by C. N. Woodworth, trustee, and afterwards the words, "for Betty Ford," were added by him. The other certificate was simply indorsed by C. N. Woodworth, trustee.

That court further finds that these certificates were sold and transferred by H. C. Brown to the First National Bank of Nashville on the 25th day of April, 1903. On the 24th of April, 1903, at 7:45 a. m., C. N. Woodworth had telegraphed the cashier of the Chattanooga Savings Bank, which had issued these certificates not to pay them. So, when the certificates were sent to Chattanooga for collection, the Chattanooga Savings Bank refused to pay them on the ground that they were not due and on the further ground that Betty Ford contested the right of the First National Bank to them. It appears, therefore, that before the First National Bank took these certificates, all the authority which C. N. Woodworth had, if any, to transfer them had been revoked by Mrs. Ford. It does not, of course appear that

he ever had authority to transfer them, especially for his own benefit.

The court of chancery appeals was of opinion that these certificates not being due and being made payable to C. N. Woodworth, trustee, in the one instance, and to C. N. Woodworth, trustee for Betty Ford, in the other, and so indorsed, destroyed the negotiability of the paper to the extent of giving notice that they constituted trust funds and that the purchaser must inquire into the right of the trustee to dispose of them.

We have no doubt of the correctness of the conclusion of law reached by the court of chancery appeals upon the predicate of facts found by them.

In the case of *Bank* v. *Looney,* 99 Tenn., 278, this question was considered by this court, and it was said by the chief justice, who delivered the opinion, that in a controversy between a beneficiary of a trust fund and the holder of a paper disposed of by a trustee in violation of his trust, the word "trustee," appearing upon the face of the paper, is sufficient to put any taker upon notice. The court in that case [on page 291] referred to the authority of *Duncan* v. *Jordan,* 15 Wall., 175, in which it was held that the word "trustee" gave notice of the existence of a trust and that the party taking the paper was charged with the duty of ascertaining what, if any, restrictions were imposed upon the trustee.

The court also cited the case of *Third National Bank of Baltimore* v. *Lange,* 51 Md., 138.

This court further remarked that "The correctness of

these holdings is now conceded by the court with practical unanimity. The effect of them is that, if the trustee, Sykes, disposed of this paper in violation of his trust, then the word "trustee" would convert anyone who so obtained it into a constructive trustee, at the instance of the *cestui que trust.*"

To the same effect is *Fox* v. *Bank,* decided by the court of chancery appeals, and reported in 35 L. R. A., 678, in which Judge Wilson stated as follows: "In the contest between the beneficiary of these notes (assuming that Anderson was not their real owner) and the transferee of Anderson, the fact that the notes, on their face, appeared to be payable to him as trustee would put the transferee on notice and the claims of the beneficiaries would be superior." *Alexander* v. *Alderson,* 7 Bax., 403; *Covington* v. *Anderson,* 16 Lea, 310; *Caulkins* v. *Gaslight Co.,* 85 Tenn., 684.

It is insisted, however, on behalf of the appellants that the rule announced in *Bank* v. *Looney,* 99 Tenn., 278, and the other Tennessee cases, on this subject, has been modified and entirely superseded by what is known as the Negotiable Instruments Law, which provides in section 56 as follows: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

This section of the Negotiable Instruments Law was

construed by this court in the case of *Unaka National Bank* v. *Butler,* 5 Cates, 574, 83 S. W., 655. The court held that the effect of this section of the statute was to embody the majority rule upon the subject of notice as it has been held and administered by the courts of New York and other States and the federal courts for many years and to discard the doctrine of constructive notice which had prevailed for many years in this State. The rule as administered in this State was that, if a purchaser of negotiable paper had implied notice of prior equities or infirmities of any nature whatever in the title of the holder from whom he purchased (that is, if anything appeared upon the face of the paper or from the facts and circumstances attending its possession or sale, which would put one of ordinary prudence upon inquiry that would lead to actual knowledge of the equities or infirmities), he was bound to pursue such inquiries and was charged with notice of the facts he could have learned. Citing the Tennessee cases on the subject.

It is then stated in the opinion that the rule of constructive or implied notice had been abrogated by the Negotiable Instruments Law, enacted in April, 1899; and what may be called the majority rule was adopted by the enactment of section 56, which has already been quoted.

It will be observed that this section provides that a party "must have had actual knowledge of the infirmity

or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith."

In *Unaka Bank* v. *Butler*, 5 Cates, 574, the court was dealing with a check which did not carry on its face any notice of defective title, but notice of the infirmity was sought to be fixed by the surrounding facts and circumstances. It will be observed that, in the present case, each of these certificates of deposit was indorsed by C. N. Woodworth as trustee and we are of opinion that such an indorsement *prima facie* and presumptively fixed the purchaser with actual knowledge of want of authority in the trustee to dispose of the paper for his own benefit.

In *Third National Bank* v. *Lange*, 51 Md., 138, the note was payable to a trustee and indorsed in the same style by the trustee. The court said: "In the case of the present note, it cannot be read understandingly without seeing on its face that it is connected with a trust and is part of a trust fund. It was the duty of the bank before purchasing to have made inquiry into the rights of the trustee to dispose of it. This it wholly failed to do and, as it turned out, he was disposing of the note in fraud of his trust, the bank must suffer the consequences of the risk it assumed."

In *Shaw* v. *Spencer*, 100 Mass., 382, the court in speaking of the effect of the word "trustee," says it means trustee for someone whose name is not disclosed and there is no greater reason for assuming that a trustee is authorized to pledge for his own debt the prop-

erty of an unnamed *cestui que trust,* than the property of one who is known. In either case it is highly improbable that the right to do so exists. The apparent difference between the two springs from the erroneous assumption that the word "trustee" alone has no meaning or legal effect.

It has already been seen that one of the certificates of deposit in the case at bar was payable to C. N. Woodworth, trustee for Betty Ford, and indorsed in the same style, but actual notice to a purchaser of the fiduciary character of a paper is no more effective in the one case than in the other.

In the case of *Swift* v. *Smith,* 102 U. S., 442, it is said: "There is nothing in the case to show that Smith's purchase was not in good faith. There was nothing upon the note nor anything in the indorsement thereon to notify him that it did not belong to Jackson both legally and equitably. It was a mercantile paper and not due. . . . It is true that, if the bill or note be so marked on its face as to show that it belongs to some other person than the one who offers to negotiate it, the purchaser will be presumed to have knowledge of the true owner and its purchase will not be held to be *bona fide.*"

These authorities sustain our position that the word, "trustee," in an indorsement of this character, is express notice to a purchaser that there is a *cestui que trust* or beneficiary, and that his rights may not be sacrificed by  the trustee in the sale or pledge of the note for his own

benefit. In other words, our holding distinctly is that such an indorsement is actual knowledge to the purchaser of such paper within the meaning of section ·56 of the Negotiable Instruments Law, supra.

.. Now, it is·very true, as said by Mr. Perry in his work on Trusts, vol. 1, sec. 225: "The mere fact that· the word "trustee" is on the face of the securities cannot put a purchaser to any inquiry beyond ascertaining whether the trustee has power to vary the securities. If he has such power, a purchaser in good faith will be protected, although the trustee use the money for his private purposes. But, if a purchaser takes securities from a trustee, with the word "trustee" upon their face, in payment of a private debt due from the trustee, the sale may be avoided by the *cestui que trust,* or the purchaser may be held as trustee."

As stated in *Bank* v. *Looney,* 99 Tenn., 278, supra, the rule is that he who takes a security from a trustee with the fiduciary character displayed upon its face,.is bound to inquire of his right to dispose of it, but if upon inquiry it is found that there is no restriction upon the trustee's power of disposition, or it may be added, there is nothing in the nature of the transaction to indicate any abuse of his trust, then the title of a purchaser in good faith for value and before maturity will be protected.

It appears that our Negotiable Instruments Law is a substantial reproduction of a similar law enacted by the State of New York in the year 1896. In the year 1903 with that law on the statute books, the court of appeals

of New York decided the case of *Cohnfeld* v. *Tannen-baum*, reported in 176 New York reports. The court said, in the midst of the opinion, the signature to the check, "Isidore Cohnfeld, guardian," gave the defendant notice that presumptively the funds being paid to him were not those either of the Cohnfeld Manufacturing Co., or of Isidore Cohnfeld personally, and he was put on inquiry to ascertain the authority of Cohnfeld to apply the money in payment of the company's debts. This proposition is conceded by both the courts below. Had he made the inquiry, he would have learned the facts which have already been stated. He is, therefore, chargeable with all that those facts import or which is fairly to be inferred from them.

Again in West Virginia, where a Negotiable Instrument Law similar to our own prevails, the supreme court of that State, held, in the case of *Hazeltine* v. *Keenan,* 54 W. Va., 600, that a negotiable note, payable on its face to a payee, with the word "attorney" suffixed to his name, indicates an interest in other parties and puts the purchaser upon inquiry as to their rights and the right of the payee to sell the note.

In addition to all this the certificates show on their face that they bear interest to maturity only at the rate of four and one-half per cent per annum, and further that they are not subject to check, but are interest bearing certificates of deposit. It further appears that they are time certificates of deposit, one of them having al-

most twelve months to run, and the other six months, at the time they were transferred. It is admitted by the officers of the First National Bank that they overlooked this fact when they bought these certificates for cash, but we agree with the court of chancery appeals that the fact that the bank overlooked these things will not relieve them of responsibility as to any notice the paper itself gives.

All these facts disclosed on the face of the paper, including the express indorsement of C. N. Woodworth, trustee, etc., gave actual notice to the bank that this paper represented a trust fund and obliged the bank to inquire into the right of the trustee to dispose of it. If the bank had made such inquiry is could easily have ascertained that the paper had been embezzled and the money lost in a gamgling transaction by the trustee; and further the bank would have discovered that, before the paper had been purchased by it, all right and authority of the trustee to act had been withdrawn.

We are therefore of opinion that the indorsements and recitals of these certificates communicated actual knowledge to the bank that they represented a trust fund and, even under the Negotiable Instruments Act, no title was acquired by the bank to the paper.